UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

**FILED**

AUG 2 3 2006

CLERK

| | | |
|---|---|---|
| CARL WARREN ADAMS, M.D., | ) | CIV. 04-5067-RHB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RAPID CITY REGIONAL HOSPITAL, | ) | |
| INC., a South Dakota corporation; | ) | MEMORANDUM OPINION |
| CARDIOLOGY ASSOCIATES, P.C., | ) | AND ORDER |
| a South Dakota corporation, d/b/a The | ) | |
| Heart Doctors; ALEX SCHABAUER, | ) | |
| M.D.; and JOHN DOES 1-5, | ) | |
| individuals, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | BACKGROUND | 2 |
| | A. FACTS | 2 |
| | B. PROCEDURAL HISTORY | 15 |
| III. | STANDARD OF REVIEW | 16 |
| IV. | DISCUSSION | 17 |
| | A. BREACH OF CONTRACT CLAIM AGAINST RAPID CITY REGIONAL HOSPITAL ("RCRH") | 18 |
| |    1. Express Contract | 19 |
| |    2. Implied Contract | 30 |
| | B. ANTICIPATORY REPUDIATION CLAIM AGAINST RCRH | 34 |
| | C. PROMISSORY ESTOPPEL CLAIM AGAINST RCRH | 35 |
| | D. DECEIT, FRAUDULENT & NEGLIGENT MISREPRESENTATION, AND FRAUDULENT CONCEALMENT CLAIMS AGAINST RCRH | 37 |
| | E. NEGLIGENCE CLAIM AGAINST RCRH | 45 |
| | F. DEFAMATION & DEFAMATION *PER SE* CLAIMS AGAINST CARDIOLOGY ASSOCIATES ("THE HEART DOCTORS") & ALEX SCHABAUER, M.D. | 46 |
| | G. INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS OR EXPECTANCY AGAINST THE HEART DOCTORS & ALEX SCHABAUER, M.D. | 48 |
| V. | CONCLUSION | 53 |

## I.       INTRODUCTION

Plaintiff Carl Warren Adams, M.D., filed a complaint against defendants Rapid City

Regional Hospital, Inc. ("RCRH" or "hospital"), Cardiology Associates, P.C. ("The Heart

Doctors"), Alex Schabauer, M.D., and John Does 1-5, alleging numerous causes of action.  In his

claims against RCRH, plaintiff alleges breach of contract, anticipatory repudiation, promissory

estoppel, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment,

deceit, and negligence.  Plaintiff's causes of action against The Heart Doctors and Dr. Schabauer

include defamation, defamation *per se*, and intentional interference with business relations or

expectancy.  Before the Court are motions for summary judgment filed by RCRH, The Heart

Doctors, and Dr. Schabauer (collectively, "defendants").  RCRH's separately filed motion for

summary judgment is granted as to all of plaintiff's claims.  The Heart Doctors' and Schabauer's

motion for summary judgment is granted in part and denied in part, because genuine issues of

material fact exist as to plaintiff's claim for intentional interference with business relations or

expectancy.

## II.      BACKGROUND

### A.      FACTS

In 1999, plaintiff began providing *locum tenens* coverage as a cardiovascular surgeon at

RCRH, whereby he would serve as an on-call substitute for absent physicians.  (Defs.' Statement

of Material Facts ("DSMF") at 1.)  While plaintiff was functioning in that capacity in 2000,

Richard Haeder, the Chairman of the RCRH Board of Trustees, offered plaintiff a position with

the hospital as a cardiovascular surgeon.  (Pl.'s Resp. & Additional Statement of Facts

("PRASF") at 2.)  At the time of RCRH's offer, plaintiff was provided a written employment

2

contract. (DSMF at 2.) However, plaintiff declined to sign the employment contract because of RCRH's and The Heart Doctors' conflict over the hiring of cardiovascular surgeons. (Id.) Plaintiff's refusal also derived from his concern that he would not receive surgical referrals from The Heart Doctors if he accepted RCRH's offer of employment. (Id.)

In November 2002, Adil Ameer, the hospital's then-Chief Executive Officer, directed Scott Zieske, the hospital's Director of Physician Recruitment, to again ascertain whether plaintiff had any interest in being considered as a cardiovascular surgeon for RCRH. (Id.) Toward the end of that same month, plaintiff visited RCRH and met with several hospital officials, including Ameer. (Id.) During plaintiff's meeting with Ameer, the two discussed the possibility of a heart institute being initiated through the hospital as a separate surgical department. (Pl.'s Dep. at 67.) At the conclusion of their discussion, plaintiff acknowledged that he could assist Ameer in improving the heart program at the hospital. (Id.)

Plaintiff next met with Ameer on February 7, 2003. (Id. at 75.) On that date, plaintiff and Ameer discussed how to proceed in securing plaintiff with a cardiovascular surgeon position at the hospital. (Id. at 76-77.) As plaintiff stated to Ameer, in order for plaintiff to accept a job as a cardiovascular surgeon at RCRH, he would have to become the chief of cardiovascular and thoracic surgery as well as the director of the cardiovascular intensive care unit. (Id. at 77.) In addition to those positions, plaintiff wanted to be considered for the directorship of the heart institute when, and if, it became part of the hospital. (Id. at 78.) Ameer informed plaintiff that his potential role with a future heart institute would be addressed at a later date. (Id. at 78-79.) With regard to pay, plaintiff sought incentives to direct the intensive care unit and told Ameer that he would consider a salary range between $650,000 to $700,000. (Id. at 79.) Ameer

3

responded by stating plaintiff's range was high; however, according to plaintiff, Ameer stated

that a base salary between $500,000 and $550,000, plus the directorship of the intensive care unit

"could be worked out." (Id. at 80.) According to plaintiff, an additional $150,000 for serving as

the director of the intensive care unit was also part of his compensation. (Id. at 85.)

At the conclusion of their meeting, Ameer instructed Rick Giesel, Vice President of

Networking Services, to "get it done." (Id. at 86.) Following these instructions, Ameer and

plaintiff shook hands and set a tentative start date of May 1, 2003. (Id. at 83.) Giesel then

informed plaintiff that he was going to prepare and send a letter of intent to plaintiff's residence.

(Id. at 86.) When Ameer and Giesel reconvened after the meeting with plaintiff, Voni Anderson,

Giesel's Administrative Assistant, overheard Ameer tell Giesel "to get the employment

agreement out," and then gave Giesel a high-five. (Voni Anderson Dep. at 70.) In referencing

the preparation of an employment agreement, Ameer was also overheard stating, "It's a done

deal. Let's get it done." (Id. at 71-72.) Giesel subsequently instructed Anderson to draft the

following document and send it out that day. (Voni Anderson Sworn Statement at 10.) The

letter was sent on February 7, 2003, and Plaintiff received it the next day. (Pl.'s Dep. at 86-87.)

RCRH's "Letter of Intent/Offer" provided in relevant part as follows:

On behalf of the Administration, Medical Staff of Rapid City Regional Hospital
and The Cardiac Institute, we are pleased about the preliminary interest you have
shown in possibly re-locating your cardiovascular surgery practice to our
community.

Please accept this letter as a written summary and description of a recruitment
incentive and employment package we have developed for your consideration.
Keep in mind, this is a preliminary Letter of Agreement and may not be all-
inclusive. We can have further negotiations, discussions, develop additional
details and incorporate them into our final contractual agreement.

Based on our discussions, we are prepared to offer the following parameters:

4

1)   A three-year guaranteed minimum salary of $400,000 per year with either an annual production bonus based on a percentage of professional collections or another non-production incentive based upon a methodology that we mutually agree upon.

2)   A comprehensive Benefits Plan as outlined in the attached overview document.

3)   38 days off per year inclusive of 20 vacation days (Monday-Friday); 10 days CME (Monday-Friday) and 8 holidays.

4)   Up to $7500 in annual CME [Continuing Medical Education] expenses (based on actual cost).

5)   Cell phone and beeper service.

6)   Household moving expenses (using the RCRH preferred vendor, United Van Lines)[.]

7)   Full assistance in marketing, practice management, staffing, outreach and networking services for your practice within the framework and under [the] auspices of the Cardiac Institute.

Although there may be additional details to work through prior to signing a final contract, we want this letter to serve as a formal offer of employment contingent, of course, on routine reference and background checks. By your signature and returning this letter, we will assume your agreement in principle of this offer. At that time we will begin to formalize the final contractual agreement.

We are certainly looking forward to working with you, Dr. Adams, and we eagerly await your reply.

(RCRH's Letter of Intent/Offer, dated Feb. 7, 2003.) Neither the position of chief of the cardiac institute nor the directorship of the intensive care unit were offered in RCRH's February 7 letter. (Id.; Pl.'s Dep. at 93-94.) According to plaintiff, many of the terms within the enumerated paragraphs of the letter were either incorrect, such as his guaranteed minimum salary, or not addressed during the February 7 meeting between plaintiff and Ameer, such as the incentive bonus program and moving expenses. (Pl.'s Dep. at 90-92.)

5

On February 10, 2003, plaintiff contacted Ameer to go over the letter of intent and, specifically, the issue of compensation. (Id. at 101.) During their conversation, plaintiff told Ameer that he received the letter of intent offering $400,000 in salary. (Id.) Plaintiff informed Ameer there was no mention of compensation for the directorship of the intensive care unit. (Id.) According to plaintiff, Ameer directed plaintiff to change his salary from $400,000 to $550,000 on the letter and send it back to Giesel. (Id. at 101-02.)

Plaintiff also telephoned Giesel on February 10, 2003, to discuss the contents of the letter of intent. (Id. at 87-88.) In their discussion, plaintiff stated that $550,000 was the minimum salary requirement for the position of cardiovascular and thoracic surgeon, and that $150,000 was the remuneration for directing the intensive care unit. (Id. at 96.) Plaintiff changed the letter of intent by increasing the salary from $400,000 to $550,000. (DSMF at 4; Pl.'s Compl. Attach. A.) On that same day, plaintiff signed the document and faxed it back to the hospital. (DSMF at 5.) However, the faxed copy did not contain the change in compensation, or make any reference to plaintiff's positions as the chief of the cardiovascular and thoracic surgery department and director of the intensive care unit. (Pl.'s Ex. 3, dated Feb. 10, 2003.)

Plaintiff mailed the original letter of intent back to RCRH on February 11, 2003. The original letter of intent, too, did not contain any changes. (Defs.' Ex. 5, dated Feb. 10, 2003.) Attached to the original, though, was a separate letter addressed to Giesel. (DSMF at 5; Pl.'s Ex. 6.) In his letter to Giesel, plaintiff acknowledged that he had concerns and questions about the February 7 letter of intent. (Pl.'s Dep. at 109.) He stated twice in his letter that he "look[ed] forward in proceeding with contractual agreement negotiations," and that he "agree[d] with the offer in principle, with the exception of salary and production incentives" which he was sure

6

could be negotiated without much difficulty.  (DSMF at 5; Pl.'s Ex. 6.)  According to plaintiff's testimony, "[t]here were things that needed to be discussed as far as . . . directing the cardiac institute . . . [and] running the intensive care unit."  (Pl.'s Dep. at 109.)  He needed to negotiate his health benefits package, (id.), as well as his salary and production incentives, (id. at 110).  Based on the their conversations and plaintiff's attached letter, Giesel believed plaintiff had rejected the proposed salary and wanted to negotiate a different salary and bonus plan.  (DSMF at 6.)

On February 12, 2003, Zieske contacted plaintiff via e-mail advising him that RCRH had received the letter of intent and that the next step was to develop an employment agreement based upon the letter of intent.  (Id.)  At this juncture, plaintiff understood the process as one where he and the hospital were going to discuss the directorship of the intensive care unit and heart institute, as well as close the deal.  (Id.)  Zieske, then, prepared a draft of a physician employment agreement and sent it to plaintiff on February 25, 2003.  (Id.)  The employment agreement was received by plaintiff on February 28, 2003.  (Pl.'s Dep. at 115.)

After receiving the agreement, plaintiff informed the hospital that he would review its terms and contact RCRH with his suggestions on March 3, 2003.  (DSMF at 6.)  The physician employment agreement provided for a three-year term of employment, a base salary of $400,000, an incentive bonus plan, the payment of moving expenses, and various other fringe benefits.  (Pl.'s Ex. 9.)  No terms were included in the agreement with regard to plaintiff's roles as director of the intensive care unit and chief of the cardiac institute.  (Id.)  Following his examination of the agreement, plaintiff talked to Giesel "about the major points of agreement that we had in our contract."  (Pl.'s Dep. at 117.)  Giesel instructed plaintiff to note his changes and return the

document to RCRH.  (Id.)  On March 1, 2003, plaintiff marked his alterations in red ink on the

document and authored another letter addressed to Giesel, notifying RCRH of plaintiff's

revisions and pointing out the agreement's clerical errors.  (Id.; Pl.'s Exs. 9 & 10.)

The text of plaintiff's letter to Giesel reads as follows:

Thank you for sending the enclosed Physician Employment Agreement.  I have reviewed the contract and if in mutual agreement would like to add or amend the following change(s).  I agree in principle, and do not see any problems with the language of the agreement with the exception of the following:

I am a physician who specializes in Cardiovascular and Thoracic Surgery, with additional certification in Surgery, and Surgical Intensive Care.  I also specialize in Vascular Surgery, [and] I have my DEA and SD medical licenses.

My duties include all the above, and would be able to direct the Cardiac Surgical Intensive Care Unit.

Page (6), [sic] I would like the Institute to reimburse me for all of my Cardiac Professional organizations, as this adds additional credibility to my practice, and directly benefits the Institute.

As a cardiac surgeon with over 15 years of operative experience, and in excess of 4000 open hearts, [and] a prior Chief of Cardiac Surgery Programs, [my] base salary should be commensurate with that experience, [sic] therefore a base salary of $500,000 annually is acceptable.  We can discuss the productivity scale, but as I mentioned, the idea of productivity for a cardiac surgeon is difficult.  We do not generate the cases for surgery. Cases are dependent upon the cardiology referral pattern.  In my experience, our hands are tied to referring cardiologist's [sic].  With the alliance of the Institute cardiologists referring cases, I do not see a problem surpassing the base.  Additionally, I would supervise the Cardiac Surgical Unit, in a full administrative capacity, with attendant protocols, and inservices for nursing staff.  An incentive of $10,000 p/month [sic] would offset the need for Incentive cardiac surgical pay.

In lieu of relocation expensive [sic] or moving via United Van Lines, I would request a $10,000.00 relocation allowance.  I would use this to purchase a home, rent or quickly get settled in Rapid City.  I would not move household goods at your expense.

8

Page (9), [sic] refers to Insurance Coverage, [sic] am I to assume, the standard "tail coverage" of 7 years after the last date of employment. [sic]

I would also like to be considered as the clinical director of the Institute, with direct reporting to the CEO or Hospital Board.  I believe with the current surgeon(s) not aligned with the Hospital, a conflict of professional interest my [sic] occur.  Certainly as the first Cardiac Surgeon to be employed by the Hospital, I can offer my surgical and administrative skills to insure quality in the program.

Schedule 1 should read Cardiovascular Surgeons, and should be 90th to 100th percentile by MGMA.  I used the MGMA scale in Hawaii, and felt the data off by 5-10%.[*]

The Benefit section is excellent, [sic] I will direct those questions to the Vice-President of Human Resources on my visit.

Please review those changes, and I would be more than happy to return again to Rapid City to discuss those points in person.

(Pl.'s Ex. 10, dated March 1, 2003.)  This letter, along with the original draft of the physician employment agreement with several handwritten changes, were returned to RCRH.  (DSMF at 8.)  Although plaintiff's complaint in this matter contained a signed physician agreement as an attachment, the returned original agreement did not bear plaintiff's signature.  (Pl.'s Ex. 9; Pl.'s Dep. 125-28.)

On March 4, 2003, plaintiff authored another letter addressed to Chief Executive Officer Kirk Dignum of Mercy Medical Center, located in Durango, Colorado, where plaintiff also resides.  (Pl.'s Ex. 28.)  Upon his arrival in Durango in 2000, plaintiff had been involved with Mercy Medical Center, (pl.'s dep. at 136-37), with which he submitted an application for

---

[*]  The percentile used in plaintiff's letter is a reference point obtainable through a standardized, national hospital tracking system, which is then utilized to gauge a particular physician's average salary.  (See Pl.'s Dep. at 119-20.)

9

privileges in August or September of 2002, (id. at 135). During that time, Mercy Medical Center was in the process of opening a heart program and asked plaintiff to help spearhead the effort to start that program. (Id. at 136.) However, according to his letter, because plaintiff "was asked to become, and accepted the Cardiovascular Surgeon-in-Chief position" at RCRH, (pl.'s ex. 28.), plaintiff withdrew from further consideration for a surgical position at Mercy Medical Center and stated his opinion of its heart program, (pl'.s dep. at 139-40). This letter was written by plaintiff at the request of Mercy Medical Center's administration. (Id.) Prior to sending this letter, though, plaintiff did not discuss the letter or its contents with anyone at RCRH. (Id. at 138.)

On March 5, 2003, plaintiff, Zieske, and Giesel discussed RCRH's employment offer. (Pl.'s Ex. 13.) At that juncture, two or three issues remained open to negotiation. (Id.) These issues, which were seen as issues that would be best addressed "face to face," included plaintiff's compensation and base salary, incentive and bonus plan, and benefits presentation. (Id.) The parties also needed to discuss the medical directorship, contract signing, and start date, (id.), though plaintiff had a projected arrival date of May 1, 2003, (pl.'s exs. 18 & 26). In addition to "face to face" meetings with hospital administrators to "close the deal," plaintiff and Giesel discussed setting up a tour of Rapid City neighborhoods with a realtor. (Pl.'s Ex. 13.) Plaintiff and his wife were scheduled to visit Rapid City on March 19-21 "to finalize the contract and look at suitable housing," (pl.'s ex. 14), but they were unable to attend because of a snowstorm in Colorado, (pl.'s dep. at 160). In late March 2003, these meetings were scheduled again for April 6-7, 2003, (id. at 163), for the purpose of obtaining plaintiff's "signature on an employment agreement," (pl.'s ex. 15). However, the meetings set for April 6-7 did not occur. (Pl.'s Dep. at 167.)

The meetings scheduled for April 6-7 were cancelled due to changes in the hospital's leadership and administration, which occurred in the latter part of March 2003, (DSMF at 9; PRASF at 16), when Ameer was terminated as RCRH's Chief Executive Officer, (pl.'s dep. at 173). As a result of the firing, administrative responsibilities for all medical staff issues were reassigned by RCRH's Board of Trustees to Dr. Charles Hart, (DMSF at 9; PRASF at 16), who until that time was RCRH Medical Liaison Officer, (Hart dep. at 11). Hart, then, assumed command of the hospital as interim Chief Executive Officer. (Pl.'s Dep. at 173.) Pursuant to the Board of Trustees' mandate to Hart to protect RCRH's best interests, Hart determined that RCRH would not proceed with the recruitment and hiring of cardiologists and cardiovascular surgeons. (DSMF at 9). Therefore, in early April 2003, Hart instructed Giesel and Zieske to suspend the recruitment of cardiologists and cardiovascular surgeons. (Id.; see Pl.'s Ex. 17.)

On April 17, 2003, plaintiff wrote a letter to Zieske stating, "I hope things shake out soon, and that I can get up to Rapid City and support the open heart program. I understand the current turmoil cannot be avoided." (Pl.'s Letter to Zieske, dated April 17, 2003.) On April 24, 2003, plaintiff was formally notified by the hospital that Ameer had been discharged, that Hart was appointed as interim Chief Executive Officer, and that business was not going well in the hospital's front office. (Pl.'s Dep. at 173.) Due to the state of chaos at RCRH, plaintiff was also notified that "the plans for the cardiovascular institute were on hold" and that plaintiff would receive a call from Hart on either May 1 or 2. (Id.) In his conversation with Hart on May 8, 2003, plaintiff was further informed that "the hospital was in a state of disarray, that Adil [Ameer] received a vote of nonconfidence [sic] from the medical staff," (id. at 175), and that RCRH's Board of Directors had placed a hiring freeze into effect, (id. at 180). At that point, the

11

Board of Directors dictated the reorganization of the hospital, changed the direction of its physician pool, and decided who to hire. (Id. at 180-81.)  As a consequence, plaintiff was told by Hart that he had no guidance and needed more time to figure out the direction of the heart program. (Id. at 175.)  According to plaintiff, he responded to Hart's comments by stating that he "had a contract to start on May 1st." (Id.)  Hart told plaintiff to "hang in there, hold on." (Id.)

In the months that followed, there was a great deal of turmoil and uncertainty in the leadership of RCRH.  (DSMF at 10; see Pl.'s Letter to Zieske, dated April 17, 2003.)  Within this time period, despite this tumult taking place at RCRH, plaintiff did not receive a writing stating that the offer was withdrawn or that he would not work for the hosptial.  (Hart's Dep. at 127-28.)

Toward the middle of June 2003, plaintiff was asked to perform *locum tenens* work at RCRH.  (Pl.'s Dep. at 186.)  Prior to beginning this part-time work, plaintiff talked with Hart and Zieske.  (Id. at 188-89, 191.)  In a conversation with Hart, he stated that the hospital was having problems covering its shifts with certain doctors.  (Id. at 188.)  At that time, plaintiff declared that a discussion was necessary to determine plaintiff's start date as a full-time surgeon, rather than part-time, with RCRH.  (Id.)  Hart responded by telling plaintiff to hold on, (id. at 188-89), because Hart was not an integral part in discussing plaintiff's potential employment, and he did not think plaintiff completed a formal agreement, (Hart's dep. at 137).  During that time and in a separate conversation, Zieske commented to plaintiff that "The Heart Doctors would ice any surgeon hired by the hospital."  (Pl.'s Dep. at 190-91.)  Nevertheless, plaintiff provided RCRH's attorney, Kevin Burr, with plaintiff's own independent contractor agreement for his work as a *locum tenens* surgeon for RCRH.  (Id. at 189.)  This agreement was signed and fully performed

12

by both plaintiff and RCRH.  (DSMF at 12.)  From August through October 2003, plaintiff went to work for RCRH in a *locum tenens* capacity.  (Pl.'s Dep. at 191.)

During plaintiff's last *locum tenens* stint with RCRH, near the end of October 2003, plaintiff became privy to an ultimatum from The Heart Doctors, in which it declared that it would not send plaintiff any cases if he covered the hospital as a full-time surgeon.  (Id.)  Feeling it was his only opportunity to confer with Hart, plaintiff stated to Hart that he had been promised a full-time job with RCRH, that he had remained available to RCRH, and that he was no longer going to provide *locum tenens* services for RCRH.  (Id. at 191-92.)  Aware that RCRH's reorganization was still taking place, plaintiff advised Hart that he needed to know if the direction of the hospital had changed.  (Id. at 192.)  At that juncture, plaintiff was directed to RCRH's legal department where he met with Burr, an in-house RCRH attorney.  (Id. at 206.)

In his meeting with Burr, plaintiff was informed that things were tough due to the ongoing problems at the hospital.  (Id. at 206-07.)  Burr inquired whether plaintiff "could still become part of the plan because [Burr] thought there was an avenue [plaintiff] could link up with the hospital" and another doctor.  (Id.)  Plaintiff declined to work with a doctor he did not know and whom plaintiff thought was not a good surgeon.  (Id. at 207.)  Burr then asked if plaintiff was harmed in any way, whereby plaintiff answered affirmatively and stated that he had passed up "several opportunities over [the] last few months to become part of this program here."  (Id.)  In answering Burr's question whether plaintiff would return to RCRH in a *locum tenens* position in the negative, plaintiff was of the opinion that RCRH would not need him any longer due to the hiring of another doctor.  (Id.)

13

Plaintiff also met with defendant Dr. Schabauer at the conclusion of plaintiff's October 2003 *locum tenens* work for the hospital. (Id. at 200.) According to plaintiff, Schabauer boasted about how no one would perform surgery in Rapid City without The Heart Doctors' blessing. (Id. at 201.) Schabauer then sought information about whether plaintiff was planning on establishing a medical practice in Rapid City. (Id.) Plaintiff responded by stating he was supposed to be working for the hospital. (Id.) At that point, Schabauer declared to plaintiff that he would "never work for the hospital," (id.), unless he was "an employee of The Heart Doctors," (id. at 203). Though the discussion between plaintiff and Schabauer was friendly, (id. at 210), plaintiff was subsequently informed by another doctor that Schabauer called plaintiff "a bad surgeon," (id. at 211). This statement was alleged to have taken place at an executive committee meeting, where chairpersons for each RCRH department and leaders of the medical staff attend. (Pl.'s Resp. & Additional Statement of Facts at 2.) As a department chairperson, Schabauer attended these executive committee meetings, along with other prominent members of the medical community. (Id. at 2-3.) Plaintiff, however, was not present and did not personally hear Schabauer make that statement. (Pl.'s Dep. at 204.) And while serving in a leadership role with the hospital, Hart also attended executive committee meetings. (Hart's Dep. at 88.) Although present at these meetings, Hart did not hear plaintiff being discussed. (Id.)

Hart, too, conferred with The Heart Doctors concerning plaintiff, wherein physicians with The Heart Doctors opined that plaintiff was not an individual seen as part of a successful heart program within Rapid City. (Id. at 85.) According to Hart, because The Heart Doctors wanted a heart surgeon with vast experience, they felt plaintiff did not have "the experience necessary to take on more complicated cases." (Id. at 86.) The Heart Doctors, then, would not refer patients

14

to plaintiff, (id. at 100), which affected Hart's, and in turn RCRH's, decision not to have plaintiff

practice in the Rapid City area, (id. at 101).  Without sufficient referrals from The Heart Doctors,

RCRH would not be able to afford to employ a surgeon with no cases to perform.  (Id. at 101-

02.)  However, contrary to The Heart Doctors' feelings, Hart rated plaintiff's outcomes for

selected types of cases as "good to very good."  (Id. at 98.)

      Finally, on November 17, 2003, plaintiff was presented with a $10,000 check signed by

Hart and a "Release and Waiver Agreement" signed by Giesel.  (Pl.'s Compl. Attachs. D & E.)

The waiver document stated, in pertinent part, the following:

> I, Carl W. Adams, M.D., have been offered a general severance payment
> in the amount of ten thousand dollars ($10,000.00) in return for signing this
> Release and Waiver Agreement ("Agreement").
>    . . . .
> In exchange for the valuable benefits, terms, and conditions of this
> Agreement, I unconditionally RELEASE Rapid City Regional Hospital, Inc., . . .
> from any and all claims arising out of my prior association as a locum tenens
> physician for the Hospital and from the termination of negotiations regarding
> employment.  I agree that this release and waiver is meant to be as general as
> possible and covers all claims of any nature that exist at this time, including, but
> not limited to, breach of contract claims, tort claims, and claims under any
> jurisdiction, including state, federal, or local law.
>    . . . .
> This Agreement sets forth the entire agreement between myself and the
> Hospital, and fully supersedes any and all prior agreements or understandings, oral
> or written, that we may have had pertaining to the subject matter hereof.

(Id.)  Plaintiff, however, did not sign this waiver or accept the check.  (Id.)

### B.   PROCEDURAL HISTORY

      On August 3, 2004, plaintiff filed suit alleging numerous causes of action and seeking

damages against RCRH, The Heart Doctors, and Schabauer.  In his claims against RCRH,

plaintiff alleges breach of contract, anticipatory repudiation, promissory estoppel, fraudulent

misrepresentation, negligent misrepresentation, fraudulent concealment, deceit, and negligence. Plaintiff's causes of action against The Heart Doctors and Schabauer include defamation, defamation *per se*, and intentional interference with business relations and expectancy.

RCRH moved for summary judgment on September 30, 2005. Plaintiff filed his response on October 20, 2005. RCRH's reply followed on October 21, 2005, but due to several discovery disputes and delays, plaintiff was permitted to file a supplemental brief. On March 9, 2005, plaintiff filed his supplemental response.

Due to The Heart Doctors' and Schabauer's confusion with the Court's deadlines, a motion for leave to file a motion for summary judgment was submitted on October 5, 2005. This motion was granted, and on November 1, 2005, The Heart Doctors and Schabauer filed a motion for summary judgment. Plaintiff responded on November 21, 2005, and The Heart Doctors and Schabauer replied on December 6, 2005.

## III.   STANDARD OF REVIEW

"Summary judgment is proper if, viewing the record in the light most favorable to [plaintiff], there is no genuine issue of material fact" and defendants, whether individually or collectively in this case, are "entitled to judgment as a matter of law." Myers v. Richard County, 429 F.3d 740, 750 (8th Cir. 2005) (citing Fed. R. Civ. P. 56(c) (1987)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). As such, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly support motion for summary judgment . . . ." Id. at

16

247-48, 106 S. Ct. at 2510 (emphasis in original). "There is no genuine issue of material fact if the evidence is such that no reasonable jury could return a verdict for [plaintiff]." Robinson v. White County, Ark., 452 F.3d 706, 709 (8th Cir. 2006) (following Anderson, 477 U.S. at 248, 106 S. Ct. 2510). Initially, "[t]he party moving for summary judgment has the burden of proof to show there is no genuine issue of material fact." Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780, 783 (8th Cir. 2006) (adhering to Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Once the moving party satisfies this burden, however, the non-moving party bears an affirmative burden "to go beyond the pleadings and, by affidavit or otherwise, produce specific facts that show that there is a genuine issue for trial." Janis v. Biesheuvel, 428 F.3d 795, 799 (8th Cir. 2005); Fed. R. Civ. P. 56(e). See Simpson v. Des Moines Water Works, 425 F.3d 538, 541-42 (8th Cir. 2005).

## IV.   DISCUSSION

Plaintiff, a citizen of Colorado, commenced this action against these South Dakota defendants, satisfying the requirement of complete diversity of citizenship between the parties. 28 U.S.C. § 1332(a) (2005). Plaintiff seeks damages exceeding the statutory amount enunciated in 28 U.S.C. § 1332. Id. (mandating an amount in controversy exceeding $75,000, exclusive of interest and costs). Because suit was brought in this federal district, South Dakota is the forum state and its laws determine the rights of the parties in this diversity action. See Pecoraro v. Diocese of Rapid City, 435 F.3d 870, 873 (8th Cir. 2006) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

17

## A.    BREACH OF CONTRACT CLAIM AGAINST RCRH

"A contract is an agreement to do or not to do a certain thing." S.D. CODIFIED LAWS §

53-1-1 (1939); Weitzel v. Sioux Valley Heart Partners, 2006 SD 45, ¶ 22, 714 N.W.2d 884, 892.

Because the determination of whether a valid contract exists is a question of law, the Court must

resolve the issue. Weitzel, 2006 SD 45, ¶ 22, 714 N.W.2d at 892 (following Werner v. Norwest

Bank S.D., N.A., 499 N.W.2d 138, 141 (S.D. 1993) (citation omitted)). "Elements essential to

existence of a contract are: (1) Parties capable of contracting; (2) Their consent; (3) A lawful

object; and (4) Sufficient cause or consideration." S.D. CODIFIED LAWS § 53-1-2 (1939).

"Consent of the parties to a contract must be: (1) Free; (2) Mutual; and (3) Communicated by

each to the other." S.D. CODIFIED LAWS § 53-3-1 (1939). "Consent is not mutual unless the

parties all agree upon the same thing in the same sense." S.D. CODIFIED LAWS § 53-3-3 (1939).

The parties' words and actions are considered when determining the existence of mutual consent.

In re Estate of Neiswender, 2003 SD 50, ¶ 20, 660 N.W.2d 249, 253 (Neiswender II).

"A contract may be either express or implied, but not both." Weitzel, 2006 SD 45, ¶ 22,

714 N.W.2d at 892 (adhering to S.D. CODIFIED LAWS § 53-1-3 (1939)). "An express contract is

one, the terms of which are stated in words[,]" either oral or written. S.D. CODIFIED LAWS § 53-

1-3; In re Estate of Neiswender, 2000 SD 112, ¶ 9, 616 N.W.2d 83, 86 (Neiswender I). "'An

express contract results when the parties mutually express an intent to be bound by specific terms

and conditions.'" Weitzel, 2006 SD 45, ¶ 22, 714 N.W.2d at 892 (quoting Werner, 499 N.W.2d

at 141) (citation omitted). "An implied contract is one, the existence and terms of which are

manifested by conduct." S.D. CODIFIED LAWS § 53-1-3. Although the intention of the parties to

an implied contract is not manifested by explicit words, the requisite intent "is to be gathered by

18

implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction." Setliff v. Akins, 2000 SD 124, ¶ 12, 616 N.W.2d 878, 885 (quoting Weller v. Spring Creek Resort, Inc., 477 N.W.2d 839, 841 (S.D. 1991)).

"'An agreement must be sufficiently definite to enable a court to give it an exact meaning.'" Weitzel, 2006 SD 45, ¶ 23, 714 N.W.2d at 892 (following In re Estate of Eberle, 505 N.W.2d 767, 770 (S.D. 1993)). Absolute certainty is not the threshold; rather, "only reasonable certainty is necessary." Id. (further citations omitted). "If an agreement leaves open essential terms and calls for the parties to agree to agree and negotiate in the future on essential terms, then a contract is not established." Id. (citing Werner, 499 N.W.2d at 142; Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273 (9th Cir. 1970)).

### 1.     Express Contract

Although RCRH concedes that offers of employment were made to plaintiff, it argues plaintiff never accepted, thereby constituting a rejection of the offers and precluding the existence of a valid contract. (RCRH's Br. in Supp. of Mot. for Summ. J. ("RCRH Br.") at 20.) Specifically, RCRH points to the February 7, 2003, "Letter of Intent/Offer" and subsequent "Physician Employment Agreement." (Id.) With each written offer, as RCRH maintains, plaintiff contested various terms and made counter-proposals as to the salary and production incentives. (Id.) In doing so, RCRH asserts that the parties were merely negotiating, not entering into a binding employment agreement. (Id. at 20-21.) Challenging plaintiff's argument that he and Ameer formed a valid oral contract during their February 7, 2003, meeting, RCRH points to the parties' conduct after the meeting in which numerous attempts were made to finalize the

19

contract.  (Id. at 21-22.)  As a consequence, because plaintiff never agreed on the essential terms contained in each offer, RCRH contends there was no meeting of the minds and, as such, no contract of employment.  (Id. at 21.)

Plaintiff first maintains that an express contract was entered into when Ameer orally offered and plaintiff accepted a three-year term of employment commencing May 1, 2003, a total compensation package of $650,000 to $700,000, the Chief-of-Surgery position for the cardiovascular department, and directorship of the intensive care unit. (Pl.'s Resp. to RCRH's Mot. for Summ. J. ("PRR") at 5.)  In support of his argument, plaintiff proffers the testimony of Voni Anderson, Giesel's then-Administrative Assistant, and Richard Haeder, the Chairman of the RCRH Board of Trustees.  (Id. at 5-8.)  Anderson stated that plaintiff received positive feedback following his interviews and that RCRH had decided to hire him.  (Id. at 6.)  Anderson also declared that she overheard Ameer tell Giesel, "It's a done deal.  Let's get it done."  (Id.)  She then observed Ameer and Giesel giving each other a high-five.  (Id.)  According to Anderson, once Ameer left Giesel's office, she was instructed to put together plaintiff's employment agreement and send it out the same day.  (Id.)  Through Haeder's testimony, plaintiff postulates Haeder's close involvement with Ameer in seeking in-house cardiovascular surgeons, Ameer's instructions to hire cardiovascular surgeons, and Ameer's subsequent efforts in doing so, all raise a genuine issue of material fact that a contract existed with the hospital.  (Id. at 7.)  In sum, the testimony of Anderson as to Ameer's and Giesel's conduct and Haeder's statements regarding the hiring plan of RCRH, along with plaintiff's declarations, demonstrates the parties' intent and the existence of an oral contract.  (Id. at 9.)

Viewing the record in a light most favorable to plaintiff, this Court concludes that plaintiff's contract action fails as a matter of law. At the outset, plaintiff has not demonstrated the presence of a genuine dispute over the essential element of mutual consent. See S.D. CODIFIED LAWS §§ 53-3-1 & 53-3-3. Neither an agreement on the same thing in the same sense nor the words and actions of the parties established the existence of a mutually consented to contract of employment. See Neiswender II, 2003 SD 50, ¶ 20, 660 N.W.2d at 253.

Here, although plaintiff offered the testimony of Anderson to demonstrate that Ameer and Giesel wanted to "get it done" and that it was a "done deal," the context of the February 7 meeting, along with Anderson's testimony, was defined through RCRH's "Letter of Intent/Offer." Because the offer was based on the parties' discussion, the language of RCRH's "Letter of Intent/Offer" and the subsequent actions of the parties specify the hospital's intent. (RCRH's Letter of Intent/Offer, dated Feb. 7, 2003.) Per their discussion, the letter of intent offered plaintiff the following: 1) three-year term of employment; 2) $400,000 per year; 3) an annual production bonus based on a percentage of professional collections or another form of production incentive that is mutually agreed upon; 4) $7,500 in CME expenses; 5) cell phone and beeper service; 6) moving expenses using United Van Lines; and 7) marketing, management, staffing, and networking services. (Id.) These terms are not the same as those plaintiff purportedly accepted during his conversation with Ameer, militating against the formation of an oral contract. Moreover, though plaintiff claims Ameer orally offered $700,000 in monetary compensation in the February 7 meeting, Ameer testified that salary numbers or compensation for physicians were not discussed, that the then-current range of compensation was not talked about, and that there was no agreement as to salary or to overall compensation during the

21

conference. (Ameer's Dep. at 125-27.)  At that juncture, the only understanding between Ameer and plaintiff was a mutual interest in which plaintiff was interested in coming to work for RCRH and RCRH was interested in having plaintiff work for it.  (Id. at 127.)  However, "[t]here still needed to be a reconciliation of details of the compensation," such as "[s]alary, benefits, anything else that might be required in the context of him moving from Colorado to South Dakota."  (Id.)

In addition, neither the chief surgeon nor the intensive care unit positions were mentioned in RCRH's letter of intent.  Again, contrary to plaintiff's position, Ameer stated that there was "no such arrangement" to head those departments, because "[a] first year physician was never given a medical directorship."  (Id. at 135.)  "[I]t would be untenable to bring in a physician from the outside and make him director."  (Id.)  Furthermore, the directorship had recently been contracted out to a group of pulmonologists.  (Id.)

As for Haeder's testimony, though he declared that Ameer was directed to "go out and get" plaintiff, (Haeder's dep. at 76), RCRH's subsequent offer provides proof of the lack of mutual consent between the parties.  Haeder's expectation of what may occur with plaintiff in the future does not support a conclusion that the parties entered into a valid employment contract.  Indeed, RCRH pursued plaintiff as a possible surgeon, but what transpired was a failed attempt in establishing mutual assent through "the parties' words and actions."  Read v. McKennan Hosp., 2000 SD 66, ¶¶ 23-25, 610 N.W.2d 782, 786.

Next, plaintiff's claim that a written express contract existed must also fail, because the terms of RCRH's "Letter of Intent/Offer" were not accepted by plaintiff.  Upon his receipt of the hospital's letter, plaintiff telephoned Ameer on February 10, 2003, to discuss the letter's terms.  (Pl.'s Dep. at 101.)  In his conversation with Ameer, plaintiff stated that his minimum salary was

22

incorrect, that the remuneration for directing the intensive care unit was not covered, and that the incentive bonus program and moving expenses were topics that went unaddressed in the February 7 meeting.  (Id. at 90-92.)  According to plaintiff, Ameer instructed plaintiff to change the $400,000 amount on the letter to instead reflect a salary of $550,000.  (Id. at 101-02.)  On that same day, plaintiff contacted Giesel to address these issues.  (Id. at 87-88.)  Plaintiff thereafter changed the letter of intent by increasing the salary.  He then signed the letter, and faxed it back to the hospital.  Plaintiff's faxed copy of the letter of intent, though, did not contain the changes plaintiff purported to make.  (Pl.'s Ex. 3, dated Feb. 10, 2003.)  There was also no reference made to plaintiff taking on the positions of chief of the cardiovascular and thoracic surgery department and director of the intensive care unit.  (Id.)

On February 11, 2003, plaintiff mailed the original letter of intent to RCRH.  This letter, too, did not contain any alterations, but with it was an attachment addressed to Giesel.  In the attachment, plaintiff stated that he "look[ed] forward to proceeding with contractual agreement negotiations," and the he "agree[d] with the offer in principle, with the exception of salary and production incentives."  (Pl.'s Ex. 6.)  Plaintiff further testified that "[t]here were things that needed to be discussed as far as . . . directing the cardiac institute . . . [and] running the intensive care unit."  (Pl.'s Dep. at 109.)  Additionally, his health benefits package, as well as his salary and production incentives, required negotiation.  (Id. at 109-10.)

"'An agreement is the result of a mutual assent of two parties to certain terms, and, if it be clear that there is no consensus, what may have been written or said becomes immaterial.'"  Geraets v. Halter, 1999 SD 11, ¶ 16, 588 N.W.2d 231, 234 (quoting Watters v. Lincoln, 29 SD 98, 100, 135 N.W.2d 712, 713 (1912)).  Despite the factual discrepancy found in plaintiff's

testimony and the exhibits, it is undisputed that there was no manifestation of assent to RCRH's "Letter of Intent/Offer" of February 7, 2003. S.D. CODIFIED LAWS § 53-3-3. Moreover, "[t]he general rule is that an acceptance must not change, add to or qualify the terms of the offer; otherwise there is no contract." Rossum v. Wick, 74 SD 554, 557, 56 N.W.2d 770, 771 (1953) (citations omitted). Plaintiff's two respective calls to Ameer and Giesel demonstrate that plaintiff was not in agreement with the essential terms of the letter of intent. Even if plaintiff was instructed by Giesel and Ameer to change the letter's "incorrect" salary and send it back to RCRH, there was still no mention of plaintiff as head of a surgical department and the intensive care unit. Plaintiff's attached letter of February 11, 2003, addressed to Giesel provides additional evidence depicting the state of affairs between the parties and supporting the conclusion that a contract did not exist. See Geraets, 1999 SD 11, ¶ 16, 588 N.W.2d at 234 (concluding that "[e]nsuing negotiations evidence absence of intent that the purchase agreement constitutes a final and complete agreement") (citing Sabow v. Hall, 323 N.W.2d 861, 863 (S.D. 1982) (holding that no final agreement existed when negotiations between the parties continued after offer was signed)). Plaintiff's treatment of RCRH's "Letter of Intent/Offer" through his conduct and words cannot establish, as a matter of law, an acceptance, or the existence, of a binding employment contract. Weitzel, 2006 SD 45, ¶ 23, 714 N.W.2d at 892 (citing Werner, 499 N.W.2d at 141 (citation omitted)). Thus, at this juncture, under no set of circumstances favoring plaintiff's assertions in this case can there exist a genuine dispute of material fact enabling him to sustain a cause of action for breach of contract.

Because of the uncertainty between the parties as to plaintiff's salary, overall compensation, percentile range, titles, and production incentives, the crucial elements of the

24

parties' potential employment contract were still being negotiated.  Id. (quoting Eberle, 505

N.W.2d at 770 (declaring that "[a]n agreement must be sufficiently definite to enable a court to

give it an exact meaning")).  In reading his attached letter to Giesel, plaintiff's interpretation of

the hospital's letter of intent is better characterized as an agreement with open essential terms

calling plaintiff and RCRH "to agree to agree and negotiate in the future on essential terms . . . ."

Id. (citing Werner, 499 N.W.2d at 142).  Giesel, too, believed plaintiff had rejected the proposed

salary and wanted to negotiate a different salary and bonus plan.  (DSMF at 6; Pl.'s Resp. &

Additional Statement of Facts at 9.)  As such, no reasonable certainty existed and a contract

between plaintiff and RCRH was not established.  See Weitzel, 2006 SD 45, ¶ 23, 714 N.W.2d at

892 (following Eberle, 505 N.W.2d at 770).

       In proceeding chronologically, plaintiff next contends that notes taken by Ameer's

administrative assistant during a RCRH Cardiac Task Force meeting create a material factual

dispute as to the finality of the "Physician Employment Agreement," because it was reported that

"nothing major" transpired with plaintiff's contract.  (PRR at 10.)  From these notations, it is

plaintiff's position that since "nothing major" was taking place as to plaintiff's employment,

RCRH considered the "major" terms of plaintiff's contract as "not outstanding as of March 6,

2003, between Dr. Adams and RCRH."  (Id. at 11.)  At a later Cardiac Task Force meeting held

on March 13, 2003, it was noted that Giesel and Zieske conferred with plaintiff "concerning his

employment agreement[,]" and that plaintiff and his wife "will visit Rapid City March 19-21 to

*finalize* the contract and look at *suitable housing*."  (Id. (emphasis supplied in brief).)  Plaintiff

was also scheduled to have "a benefits briefing," (id.), and his documentation from his prior

activities reviewed "as part of the credentialing process," (id. at 12).  On March 20, 2003,

25

plaintiff was listed as a "projected arrival" instead of under "offers pending," (id. at 13), and on

March 27, 2003, the task force minutes note that plaintiff was going to "sign the employment

agreement" during his April 6-7 scheduled visit, (id. at 12).  Because of these notations and

comments, plaintiff suggests that he "completed the details of his written, formalized, [sic]

agreement to meet those terms he agreed to with Mr. Ameer and was traveling to Rapid City

simply to affix his signature upon the employment contract."  (Id. at 12-13.)  As a final

proposition, plaintiff points to a document that listed plaintiff as a "pending arrival" but stated

nothing about continuing negotiations, suggesting that plaintiff had reached a binding agreement

with RCRH.  (Id. at 14-15.)

      However, due to plaintiff's words and actions, the Court concludes that the "Physician

Employment Agreement" was not a finalized contract.  (Pl.'s Ex. 9.)  The agreement provided for

a three-year period of employment, a base salary of $400,000, an incentive bonus plan, the

payment of moving expenses, and various fringe benefits; but, it contained nothing with regard to

plaintiff's roles as a department head and director of the intensive care unit.  (Id.)  Upon

receiving the agreement from RCRH, plaintiff reviewed its terms and wrote another letter to

Giesel on March 1, 2003, marking his alterations in red ink and notifying RCRH of the clerical

errors and revisions made to the document.  (Pl.'s Exs. 9 & 10.)  The relevant portions of

plaintiff's March 1 letter provide as follows:

> I have reviewed the contract and *if in mutual agreement would like to add or
> amend the following change(s).*  I agree in principle, and do not see any problems
> with the language of the agreement *with the exception of the following*:
>   . . . .
> > My duties include all the above, and *would be able to* direct the Cardiac
> > Surgical Intensive Care Unit.
> >   . . . .

As a cardiac surgeon with over 15 years of operative experience, and in excess of 4000 open hearts, [and] a prior Chief of Cardiac Surgery Programs, [my] base salary *should be* commensurate with that experience, [sic] *therefore a base salary of $500,000 annually is acceptable.* We can discuss the productivity scale, but as I mentioned, the idea of productivity for a cardiac surgeon is difficult. We do not generate the cases for surgery. Cases are dependent upon the cardiology referral pattern. In my experience, our hands are tied to referring cardiologist's [sic]. With the alliance of the Institute cardiologists referring cases, I do not see a problem surpassing the base. Additionally, I would supervise the Cardiac Surgical Unit, in a full administrative capacity, with attendant protocols, and inservices for nursing staff. *An incentive of $10,000 p/month [sic] would offset the need for Incentive cardiac surgical pay.*

In lieu of relocation expensive [sic] or moving via United Van Lines, *I would request a $10,000.00 relocation allowance. . . .*
. . . .
*I would also like to be considered as the clinical director of the Institute*, with direct reporting to the CEO or Hospital Board. I believe with the current surgeon(s) not aligned with the Hospital, a conflict of professional interest my [sic] occur. Certainly as the first Cardiac Surgeon to be employed by the Hospital, I can offer my surgical and administrative skills to insure quality in the program.

Schedule 1 should read Cardiovascular Surgeons, and should be 90th to 100th percentile by MGMA. I used the MGMA scale in Hawaii, and felt the data off by 5-10%.
. . . .

Please review those changes, and I would be more than happy to return again to Rapid City to *discuss those points in person.*

(Pl.'s Ex. 10, dated March 1, 2003.)

This writing, like his February 11 letter, is probative of plaintiff's intent and feelings as to the parties' positions. Plaintiff's language, in an unequivocal fashion, shows that the parties are still bargaining and are engaged in an ongoing negotiation. First, he seeks permission from RCRH to pursue the directorship of the intensive care unit with the use of the terms "and if in mutual agreement would like to add or amend the following change(s)." (Id.) Second, plaintiff

lists numerous "exceptions" to the agreement and, in so doing, negotiates with RCRH about the terms in each paragraph by using a persuasive tone.  Specifically, plaintiff merely suggests to RCRH that he "would be able to direct" the intensive care unit and that he "would like to be considered as the clinical director" for the potential Heart Institute.  (Id.)  Next, as if he was applying for a job, plaintiff provides his background in order to reassure RCRH that "a salary of $500,000 annually is acceptable." (Id.)  He then presents his case against using a productivity scale when calculating an incentive package and instead concludes that $10,000 per month would "offset the need for [i]ncentive cardiac surgical pay." (Id.)  Addressing his moving expenses, plaintiff requests a $10,000 relocation allowance, rather than having the hospital utilize United Van Lines.  (Id.)  Lastly, plaintiff corrects RCRH's use of the national hospital tracking system scale in gauging his average salary.  (Id.)  Plaintiff concludes the March 1 letter by proposing a return visit "to discuss those points in person." (Id.)

For reasons discussed, the lack of mutual consent precludes the existence of a valid contract.  S.D. CODIFIED LAWS § 53-1-2(2).  "For a contract to be enforceable, it must be possible to ascertain the full meaning with reasonable certainty." Eberle, 505 N.W.2d at 770.  Plaintiff's words demonstrate that the parties were in no way certain about the "major" terms of the "Physician Employment Agreement." See id.; S.D. CODIFIED LAWS § 53-1-2(2).  Rather, plaintiff was negotiating for a higher salary, consideration as a director of the intensive care unit, a different form of bonus, additional money for relocating to Rapid City, and a higher percentile range to determine his average salary.  The March 1 letter also contradicts plaintiff's assertion that Ameer promised a compensation package of $700,000, when plaintiff's letter negotiates for a salary of $500,000 and a locked-in incentive package for $10,000 per month, which together

28

only total $620,000.  The parties were nowhere close to agreeing on plaintiff's purported

$700,000 total compensation package.  In addition, the record is absent of any evidence, other

than plaintiff's own assertions, associating plaintiff with a $700,000 price tag.  A contract cannot

be said to exist when there has been no understanding as to exact salary, bonus, titles, and

moving expenses.  See Werner, 499 N.W.2d at 142.

Furthermore, because issues remained open to negotiation, plaintiff, Zieske, and Giesel

planned on meeting "face to face" to address plaintiff's potential compensation and base salary,

incentive and bonus plan, and benefits presentation.  Giesel believed that the parties needed to

"try to negotiate a mutually agreeable employment agreement." (Giesel's Dep. at 242.)

Although numerous plans were made concerning plaintiff's "face to face" meeting with RCRH

officials to finalize or sign the employment contract, the record is clear that no meeting took

place.  If terms of a contract are left open for settlement by future negotiation, "'there is not

complete agreement; the minds of the parties have not fully met; and, until they have, no court

will undertake to give effect to those stipulations that have been settled, or to make an agreement

for the parties respecting those matters that have been left unsettled.'"  Deadwood Lodge No. 508

v. Albert, 319 N.W.2d 823, 826 (S.D. 1982) (quoting Engel v. Heier, 84 SD 535, 537, 173

N.W.2d 454, 456 (1970)).  Here, plaintiff's planned visits and itinerary were repeatedly

rescheduled with the hope of finalizing the deal.  However, at that point, there was only

speculation as to whether a final contract would be entered into, since the terms of the "Physician

Employment Agreement" were not accepted and no meeting had taken place.  Then, due to the

hospital's change in leadership and administration, which occurred during the time plaintiff was

scheduled to meet with Giesel, Zieske, and other administrators, recruitment efforts and hiring

decisions halted.  Although plaintiff was not notified of the changes with the hospital's head offices until April 24, 2003, the parties never met, thereby leaving the essential terms subject to further negotiation.  See id.  Therefore, contrary to plaintiff's assertion that "major" terms were not outstanding, the essential terms were, in fact, left open and never settled upon between plaintiff and RCRH.  Id.

Taking the facts in a light most favorable to plaintiff, RCRH likewise envisioned finalizing an employment contract with plaintiff, even though the task force notes were not available for plaintiff to ostensibly rely upon until after his claims were filed.  Despite RCRH's hope, however, there was no legally binding contract because the parties never "passed beyond the condition of negotiation."  Geraets, 1999 SD 11, ¶ 18, 588 N.W.2d at 235 (stating also that no final agreement existed "because the parties were of a different mind).  Plaintiff merely envisaged that a contract existed.

In reviewing the vast record and pleadings, this Court concludes that there is no genuine dispute over a material fact that affects the outcome of this action under South Dakota law.  Accordingly, because no express contract existed between the parties, RCRH's motion for summary judgment on this portion of plaintiff's segmented claim is granted.

**2.     Implied Contract**

Contesting plaintiff's assertion that an implied contract was formed between the parties, RCRH argues that "the 'facts' alleged by Adams do not establish the existence of an implied-in-fact contract."  (RCRH's Reply Br. in Supp. of Mot. for Summ. J. ("RCRH Reply") at 15.)  As the hospital maintains, the steps taken throughout the negotiation period provided no value to either party and were too attenuated to create an implied contract.  (Id.)  Distinguishing the facts

of this case with those of <u>Setliff v. Akins</u>, 2000 SD 124, ¶ 13, 616 N.W.2d 878, 885, the hospital contends plaintiff rendered no services in expectancy of receiving compensation. Although RCRH and plaintiff hoped that a finalized employment contract would be realized, RCRH asserts that plaintiff was never hired or compensated by the hospital in the capacity of a full-time, contracted surgeon. (RCRH Reply at 15-16.) Ultimately, because the facts in this case are distinguishable from those in <u>Setliff</u>, (<u>id.</u> at 14-15), RCRH claims that an implied contract was not established, (<u>id.</u> at 16).

Relying on <u>Setliff</u>, plaintiff argues that the evidence supporting his express contract claim demonstrates a "clear 'implication . . . from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances' that an implied contract was formed . . . ." (PRR at 16 (quoting <u>Setliff</u>, 2000 SD 124, ¶ 12, 616 N.W.2d at 885).) Specifically, plaintiff points to Ameer's statements that "[i]t's a done deal" and "[l]et's get it done" to create a genuine factual dispute that an implied agreement culminated throughout the parties' dealings. (<u>Id.</u>) Plaintiff also suggests that the Board of Trustees' directive to Ameer to hire plaintiff is indicative of an implied contract. (<u>Id.</u>) Other alleged facts demonstrating the formation of an implied contract include: a planned real estate tour; a scheduled benefits presentation; the initiation of the credentialing process; a planned visit to sign the employment agreement; plaintiff's name under the notations "pending arrival" and "projected arrival"; and, a noted inquiry asking where plaintiff would be placed in May. (<u>Id.</u> at 17.) Finally, plaintiff contends that his letter of March 4, 2003, addressed to the Chief Executive Officer of Mercy Medical Center, demonstrates an expectancy that he had a contract with RCRH. (<u>Id.</u> at 18.)

Generally, "'the existence of an implied contract between parties creates a genuine issue of material fact to be decided by the jury' unless 'reasonable minds could not differ.'" Balster v. Wipf, 2003 SD 135, ¶ 9, 672 N.W.2d 475, 478 (quoting Van De Walle & Assoc., L.L.C. v. Buseman, 2003 SD 70, ¶ 10, 665 N.W.2d 84, 87).  In determining whether reasonable minds could differ, the Court examines each element necessary to support an implied contract. Van De Walle, 2003 SD 70, ¶ 11, 665 N.W.2d at 88.  The answers to the following relevant questions establish a finding of an implied contract: 1) whether RCRH received a benefit, id., 2) whether RCRH "accepted or acquiesced in the benefit provided" by plaintiff, id. ¶ 12, and 3) "whether it would be inequitable for [RCRH] to retain the benefit conferred by [plaintiff] without payment," id. ¶ 13.  Hence, "[t]he pertinent inquiry is whether the facts and circumstances properly evaluated permit an inference that services were rendered in expectance by one of receiving and the other of making compensation." Setliff, 2000 SD 124, ¶ 13, 616 N.W.2d at 885 (following Mahan v. Mahan, 80 SD 211, 215, 121 N.W.2d 367, 369 (1963)).  "The 'facts are viewed objectively and if a party voluntarily indulges in conduct reasonably indicating assent he may be bound even though his conduct does not truly express the state of his mind.'" Id. (quoting Weller v. Spring Creek Resort, Inc., 477 N.W.2d 839, 841 (S.D. 1991) (citation omitted)).  While conducting this examination, the totality of the parties' conduct is evaluated "'to learn whether an implied contract can be found.'" Id. (adhering to In re Estate of Regennitter, 1999 SD 26, ¶ 12, 589 N.W.2d 920, 924 (citations excluded)).

In this case, plaintiff's claim lacks merit.  There is no genuine issue of material fact that RCRH received a benefit from plaintiff.  At no relevant time during this contract matter did plaintiff provide services to, or seek compensation from, RCRH, other than providing services as

32

a *locum tenens* physician.  The "face to face" meeting never transpired; plaintiff was never hired; plaintiff did not report for work on May 1, 2003; plaintiff never performed any work pertinent to the parties' discussions regarding this contract matter; RCRH never placed plaintiff on the payroll or compensated plaintiff pursuant to the alleged contractual agreement; plaintiff did not receive a benefits package from RCRH; plaintiff was not provided moving expenses; plaintiff did not move to Rapid City to begin work; plaintiff never purchased a home or secured a residence in Rapid City.  Under these undisputed facts, therefore, plaintiff cannot reasonably claim he held an expectance to receive something in return from RCRH.  Plaintiff's reliance on Setliff fails.

Most, if not all, of the facts relied upon by plaintiff are irrelevant as to whether RCRH received a benefit.  However, plaintiff's March 4, 2003, letter to the Chief Executive Officer of Mercy Medical Center is worthy of discussion.  According to this letter, because plaintiff "was asked to become, and accepted the Cardiovascular Surgeon-in-Chief position" at RCRH, (pl.'s ex. 28.), he withdrew from further consideration for a surgical position at Mercy Medical Center (pl'.s dep. at 139-40).  Plaintiff then stated his opinion of Mercy Medical Center's heart program.  (Id.)  He authored this letter at the request of Mercy Medical Center's administration.  (Id.)

Though an unfortunate occurrence, plaintiff's conduct was unreasonable in light of the parties' relative positions as to their contract negotiations.  See Werner, 499 N.W.2d at 142.  In his March 1, 2003, letter to Giesel, only three days prior to his writing to Mercy Medical Center, plaintiff listed numerous outstanding exceptions to the "Physician Employment Agreement" and acknowledged the status of the parties' ongoing negotiations.  Indeed, the parties were working toward a finalized agreement, but plaintiff's March 1 letter to Giesel provides objective proof that a contract was not established and that there was no mutual consent.  Id.  Thus, plaintiff's act

33

in writing and sending the March 4 letter to Mercy Medical Center was unreasonable.  Given the tone of plaintiff's March 4 letter, which discredited Mercy Medical Center's heart program, he did not see himself working there anyway.  According to plaintiff, he "sincerely question[ed] the intentions of Four Corners Heart, as it is not quality that I sense, but rather economics that feed this rush, of which I would rather not be associated with." (Pl.'s Ex. 28.)  Moreover, given plaintiff's knowledge of RCRH's "political situation" and "referral patterns," no reasonable person could conclude that an implied employment contract existed between plaintiff and RCRH. (RCRH's Ex. 13.)

In analyzing the totality of the parties' conduct, the record contains no evidence raising a genuine dispute of material fact that supports plaintiff's implied contract action.  Since the first element fails as a matter of law, the implied contract claim fails.  The Court need not discuss the remaining elements.  RCRH's motion for summary judgment as to plaintiff's implied contract claim is granted.

## B.   ANTICIPATORY REPUDIATION CLAIM AGAINST RCRH

Anticipatory repudiation is defined as a "[r]epudiation of a contractual duty before the time for performance, giving the injured party an immediate right to damages for total breach, as well as discharging the injured party's remaining duties of performance." BLACK'S LAW DICTIONARY 1306 (7th ed. 1999). See Weitzel, 2006 SD 45, ¶ 31, 714 N.W.2d at 894.  As a logical antecedent, for an anticipatory repudiation action to commence, there must first be a contract between the parties.  Here, there was no contract to repudiate.  Thus, since a contract was not established under South Dakota law, plaintiff's claim for anticipatory repudiation

34

likewise fails.  Accordingly, RCRH's motion for summary judgment on plaintiff's anticipatory repudiation action is granted.

C.   **PROMISSORY ESTOPPEL CLAIM AGAINST RCRH**

RCRH maintains that it never promised plaintiff "that it was going to do anything other than attempt to negotiate an employment contract." (RCRH Br. at 26.)  Because "the parties never reached agreement upon the terms of the employment contract[,]" the hospital argues that plaintiff acted unreasonably in relying on any purported promises due to the parties' contractual uncertainty. (Id. at 27.)  Specifically, RCRH contends plaintiff's knowledge of the parties' negotiations, the uncertainty with the hospital's leadership, and the turmoil between the hospital and The Heart Doctors establishes that plaintiff acted unreasonably. (Id.)

In response, plaintiff points to his March 4, 2003, letter to Mercy Medical Center, asserting that this action was based on his reasonable belief that the parties' had reached an agreement. (PRR at 28.)  According to plaintiff, "[w]ithdrawal of an application for privileges at a hospital, as well as terminating the potential of leading the creation of a heart program within one's own home-town [sic], is a fairly drastic action on the part of a cardiac surgeon." (Id. at 28-29.)  In other words, if plaintiff did not believe he had entered into a contractual relationship with RCRH, he would have never authored his March 4 letter to Mercy Medical Center. (Id.)

"'[P]romissory estoppel may be invoked where a promisee alters his position to his detriment in the reasonable belief that a promise would be performed.'" Hahne v. Burr, 2005 SD 108, ¶ 18, 705 N.W.2d 867, 873 (quoting Canyon Lake Park, L.L.C. v. Loftus Dental, P.C., 2005 SD 82, ¶ 38, 700 N.W.2d 729, 739 (citation omitted)).  "The elements of promissory estoppel require a promise . . . ." Durkee v. Van Well, 2002 SD 150, ¶ 23, 654 N.W.2d 807, 815 (citing

Garrett v. BankWest, Inc., 459 N.W.2d 833, 848 (S.D. 1990)). The following elements must be established to employ the doctrine of promissory estoppel: "1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the promisee must have been foreseeable by the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made." Hahne, 2005 SD 108, ¶ 18, 705 N.W.2d at 873 (further citations omitted). "Estoppel is not applicable if any of these elements are lacking or have not been proven by clear and convincing evidence." Id. (following Century 21 Associated Realty v. Hoffman, 503 N.W.2d 861, 866 (S.D. 1993)).

Plaintiff's claim fails for lack of a promise as required under Durkee, 2002 SD 150, ¶¶ 23-24, 654 N.W.2d at 815, since the parties were still in the process of negotiating the major terms of an employment agreement. Plaintiff argues an oral promise was made with Ameer. Plaintiff's conclusory allegations, however, do not suffice when Ameer's testimony and RCRH's subsequent "Letter of Intent/Offer" contradict the purported terms of plaintiff's oral agreement. These terms were not mutually agreed upon. With regard to RCRH's "Physician Employment Agreement," Plaintiff authored a separate letter to Giesel on March 1, 2003, which was written only three days prior to the Mercy Medical Center letter. In his March 1 letter, plaintiff contested various terms of RCRH's "Physician Employment Agreement." Such conduct provides substantial proof that a promise was neither made nor accepted. Due to this contractual uncertainty, plaintiff could not have reasonably relied on any of the proposed contracts. See Werner, 499 N.W.2d at 142. For reasons previously discussed, the employment agreement upon which plaintiff allegedly relied was too "'vague, uncertain, and unsettled'" to sustain a claim of promissory estoppel. Id. (quoting Garrett, 459 N.W.2d at 848).

36

In addition, plaintiff was fully aware of the hospital's unpredictable situation with its leadership and administration, as well as its embattled relationship with The Heart Doctors. Under these circumstances, plaintiff never moved to Rapid City or attempted to start work as a full-time physician at RCRH.  Therefore, RCRH's motion for summary judgment is granted with regard to plaintiff's claim of promissory estoppel.

### D.   DECEIT, FRAUDULENT & NEGLIGENT MISREPRESENTATION, AND FRAUDULENT CONCEALMENT CLAIMS AGAINST RCRH

Contesting plaintiff's claims for deceit, fraudulent misrepresentation, and negligent representation, RCRH argues that the alleged representations made "must be of a past or existing fact" and that representations as to future events are generally not actionable.  (RCRH Br. at 27-28.)  RCRH points to plaintiff's deposition testimony as support, claiming plaintiff had no reason to believe that he received untrue information from Ameer during their February 7, 2003, discussion.  (Id. at 28.)  With regard to plaintiff's fraudulent concealment action, RCRH maintains that it was under no duty to disclose information to plaintiff, because the parties were involved in an arm's length business transaction.  (Id. at 34.)

Plaintiff's actions for deceit, fraudulent misrepresentation, negligent misrepresentation, and fraudulent concealment are all addressed in a single section of his supplemental brief. Initially, plaintiff contends that he relied on the statements made during his conference with Ameer on February 7, 2003.  (Pl.'s Supplemental Resp. at 4-7.)  Plaintiff grounds his contentions on the premise that on February 7, 2003, Ameer offered and plaintiff accepted a three-year employment contract for a total compensation package of $700,000, as well as the directorship and chief positions.  (Id. at 4.)  Therefore, due to these discussions and statements, plaintiff then

argues that the Court must erect an "analytical baseline" establishing, in fact, that an employment agreement existed between plaintiff and RCRH in order to proceed to the instant claims.  (Id. at 7-8.)  In addition to Ameer's February 7 offer and plaintiff's acceptance, plaintiff specifically asserts that three subsequent telephone calls create material factual disputes: 1) a call from Ameer on April 12, 2003, reaffirming plaintiff's and Ameer's agreement; 2) a call from Zieske and Giesel on April 24, 2003, informing plaintiff of Ameer's termination, but failing to inform plaintiff of Hart's decision to disallow plaintiff to begin work at RCRH; and 3) a call from Hart on May 8, 2003, reporting to plaintiff that he cannot assume his duties at RCRH.  (Id. at 10.)  According to plaintiff, because of these phone calls, plaintiff was conveyed false information upon which he reasonably relied to his detriment.  (Id. at 11.)

Pursuant to § 20-10-1 of South Dakota's Codified Laws, "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."  Id. (1939).  An act constituting deceit under § 20-10-1 is any one of the following:

(1)     The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
(2)     The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
(3)     The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
(4)     A promise made without any intention of performing.

S.D. CODIFIED LAWS § 20-10-2 (1939).  "These statutes 'are declaratory of common law and comprehend an intention to mislead.'"  Schwaiger v. Mitchell Radiology Assoc., P.C., 2002 SD

97, ¶ 10, 652 N.W.2d 372, 377 (quoting <u>Mash v. Cutler</u>, 488 N.W.2d 642, 652 (S.D. 1992); <u>Dede</u>

<u>v. Rushmore Nat'l Life Ins. Co.</u>, 470 N.W.2d 256, 259 n.2 (S.D. 1991)).

"Fraud is a representation made as a statement of fact, which was untrue and known to be

untrue by the party making it, or else recklessly made." <u>Brandriet v. Norwest Bank South</u>

<u>Dakota, N.A.</u>, 499 N.W.2d 613, 616 (S.D. 1993).  The misrepresentation must be "made with the

intent to deceive and for the purpose of inducing the other party to act upon it." <u>Id.</u>  Further, the

other party must "in fact rely and act upon the false statement to his injury or damage." <u>Id.</u>

"The tort of negligent misrepresentation occurs when 'in the course of business or any

other transaction in which an individual has a pecuniary interest, he or she supplies false

information for the guidance of others in their business transactions, without exercising

reasonable care in obtaining or communicating the information." <u>Bayer v. PAL Newcomb</u>

<u>Partners</u>, 2002 SD 40, ¶ 11, 643 N.W.2d 409, 412 (quoting <u>Meyer v. Santema</u>, 1997 SD 21, ¶ 9,

559 N.W.2d 251, 254 (citation omitted)).  Generally, in suits for either fraudulent or negligent

misrepresentation, "'representations as to future events are not actionable and false

representations must be of past or existing facts.'" <u>Id.</u> (following <u>Meyer</u>, 1997 SD 21, ¶ 11, 559

N.W.2d at 255).

As an initial matter, plaintiff's "analytical baseline" proposition is unpersuasive.

Plaintiff's argument would require the Court to presuppose the legal conclusion that a contract

existed in order to begin an analysis of whether his claims of deceit, fraudulent and negligent

misrepresentation, and concealment survive summary judgment.  In viewing the facts most

favorable to plaintiff, there was never a binding contract formed between plaintiff and RCRH on

February 7, 2003, or any time thereafter.

Next, plaintiff proceeds to premise his causes of action for deceit and misrepresentation solely on Ameer's oral representations, despite the conclusion that a contract was not established. (Pl.'s Supplemental Resp. at 4.)  As part of his burden, plaintiff must prove that he relied on Ameer's statements to sustain his claims of fraudulent and negligent misrepresentation.  See Littau v. Midwest Commodities, Inc., 316 N.W.2d 639, 644 (S.D. 1982); Aschoff v. Mobil Oil Corp., 261 N.W.2d 120, 124 (S.D. 1977).  However, if a subsequent written contract directly contradicts an alleged oral representation, "reliance on that oral representation, as a matter of law, is unjustified."  Schwaiger, 2002 SD 97, ¶ 11, 652 N.W.2d at 377 (following Davidson v. Wilson, 973 F.2d 1391, 1401 (8th Cir. 1992)).  Here, although a finalized contract was not formed, RCRH's "Letter of Intent/Offer" and "Physician Employment Agreement" were explicitly contrary to the terms of the purported oral agreement between plaintiff and Ameer. Each of RCRH's written proposed contracts contained, among other things, a vastly different salary, a lower percentile range, no mention of a directorship or chief position, and a lower amount for moving expenses.  These material facts are undisputed.  Thus, for plaintiff to ground the essential element of reliance in the alleged February 7 oral agreement is neither reasonable nor justified as a matter of law.

As to the April 12, 2003, telephone call with Ameer, plaintiff was merely asked "the status of [his] start date" and whether he finished the credentialing process.  (Pl.'s Dep. at 168.) In their discussion it seemed as if Ameer was excited about plaintiff coming to the hospital.  (Id.) Plaintiff was also informed that May 1, 2003, remained the "goal" for his start date, (id.), even though plaintiff contends he was misled about, and remained uninformed of, the changes that transpired with the hospital's leadership and administration prior to this phone call.  However,

during his conversation with Ameer, plaintiff inquired about the hiring of doctors at the hospital, whereby Ameer stated that the hospital was having difficulty in recruiting because of the problems with The Heart Doctors' rejection of candidates. (Id. at 169-70.) Plaintiff was contacted throughout this period, and on April 17, 2003, he wrote a letter to Zieske stating, "I hope things shake out soon, and that I can get up to Rapid City and support the open heart program. I understand the current turmoil cannot be avoided." (Pl.'s Letter to Zieske, dated April 17, 2003.) This letter, along with the other forms of proof and plaintiff's statements, demonstrates that plaintiff was fully aware of the longtime, consistent state of affairs between RCRH and The Heart Doctors. (Pl.'s Dep. at 170.) These findings, too, are undisputed. Plaintiff was not misled or provided with false information. See S.D. CODIFIED LAWS § 20-10-2(1) & (2).

Plaintiff then places emphasis on a note from a Cardiac Task Force meeting held on April 3, 2003, stating, "Withdrawing offer to Dr. Adams tomorrow." (Pl.'s Supplemental Resp. at 6.) Following this meeting, plaintiff's scheduled visit for April 6 was cancelled due to RCRH's changes in the front offices. Plaintiff's understanding of what had transpired at the hospital was evidenced through his April 17 letter to Zieske. Accordingly, plaintiff's actions and words show that he did not rely upon, and was not induced to do, anything with regard to RCRH's offer.

The phone calls made by Giesel and Zieske similarly lack in the requisite deceitful intent, since neither one believed plaintiff was a contracted, full-time physician. As such, Giesel and Zieske could not inform plaintiff that he would not be permitted to proceed with his employment if neither were aware of nor believed there was a binding contract in existence. Plaintiff's letter of April 17, only five days after Giesel and Zieske contacted plaintiff, demonstrates further that he knew negotiations were at a standstill with the hospital. At that point, plaintiff's future with

41

RCRH's heart program subsisted on mere hope and conjecture. (Pl.'s Letter to Zieske, dated April 17, 2003.)

Hart was not involved in the negotiating process with plaintiff. He, too, was of the belief that plaintiff had not finalized an employment agreement with the hospital. In his call to plaintiff, Hart informed plaintiff that negotiations would not continue. Nothing was stated to plaintiff that he could not perform his work as promised because such a promise was not established. Hart recommended to Ameer that the hospital not hire plaintiff. Moreover, plaintiff was not induced to uproot his residence and take further steps in relocating to Rapid City to begin work. Operating with the knowledge that plaintiff had not finalized an agreement, Hart's statement to plaintiff fails to create a material factual dispute because Hart only "ceas[ed] all discussions, negotiations, and recruitment," an exact characterization of where plaintiff stood in terms of potential employment with RCRH.

As to negligent misrepresentation, an integral requirement mandates that "the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care." Littau, 316 N.W.2d at 644. Though "privity of contract is not an essential prerequisite to maintenance of a successful action for negligent representation," Aesoph v. Kusser, 498 N.W.2d 654, 657 n.3 (S.D. 1993), there must be a showing that a duty was owed to the other party, Littau, 316 N.W.2d at 644. "No duty will be found unless a complex transaction is involved requiring one of the parties to rely on the superior knowledge of the other." Id. (citing Fleming v. Torrey, 273 N.W.2d 169, 171 (S.D. 1978); Moore v. Kluthe & Lane Ins. Agency, Inc., 89 SD 419, 428-29, 234 N.W.2d 260, 265-66 (1975)).

42

Here, RCRH cannot be said to possess superior knowledge or owe a duty to plaintiff. The relationship of the parties was one in which negotiations took place in an effort to form a contract of employment. Each party was dealing with the other at arm's length throughout the attempted transaction and stood on equal footing. Bayer, 2002 SD 40, ¶ 16, 643 N.W.2d at 413. Plaintiff was not a novice. He had been involved in several contract negotiations and had worked with numerous hospitals in both a full-time and *locum tenens* capacity. While RCRH indeed offered a position of employment, plaintiff rejected the terms of the offer and commenced negotiating with RCRH. Moreover, since as early as 2000, plaintiff knew of the turbulent atmosphere throughout the medical community in Rapid City, especially in regard to the relationship of RCRH and The Heart Doctors. Because of this troublesome relationship, plaintiff acknowledged the fact that prior physicians unsuccessfully maintained a medical practice in the area.

Finally, to prove the tort of fraudulent concealment, one of the following must be shown: "(1) the suppression of a fact by one who is bound to disclose it, or (2) the suppression of a fact by one who gives information of other facts which are likely to mislead for want of communication of that fact." Milligan v. Waldo, 2001 SD 2, ¶ 10, 620 N.W.2d 377, 380 (adhering to the deceit statute of § 20-10-2(3)). Liability is imposed in the first clause of this statute "for suppression of a fact only on '*one who is bound to disclose*' the fact." Taggart v. Ford Motor Credit Co., 462 N.W.2d 493, 499 (S.D. 1990) (emphasis in original). Pursuant to this clause, there has never been a duty imposed on parties to an arm's-length business transaction, unless there exists a fiduciary or employment relationship. Id. There is neither a fiduciary nor employment relationship in existence in this case. Id. at 500.

Although plaintiff does not pose an argument under this portion of the statute, the second clause of § 20-10-2(3) subjects a party to liability "for suppression of a fact if there was a partial disclosure which, without disclosure of the concealed information, misleads the plaintiff." Id. at 501. Plaintiff, nevertheless, was not misled and did not detrimentally rely on statements made to him during the time in which RCRH was undergoing a leadership change, because on April 17, 2003, plaintiff "underst[oo]d the current turmoil [could] not be avoided." (Pl.'s Letter to Zieske, dated April 17, 2003.) His knowledge of this turmoil has been traced back to plaintiff's dealings with RCRH in 2000. Of course, plaintiff wanted to resume in contract negotiations with RCRH, but unfortunately nothing of it.

Having admitted that additional terms needed to be worked out with the hospital, plaintiff cannot sustain an action alleging RCRH officials intentionally deceived him. The evidence demonstrates a breakdown in the negotiation process because of plaintiff's rejection, non-acceptance, or counter-proposals of RCRH's offers and, perhaps, because of third-party, outside influences. See Schwaiger, 2002 SD 97, ¶ 15, 652 N.W.2d at 379. The parties' respective actions, when compared to the corresponding dates and time frame, do not raise a genuine dispute of material fact. To permit plaintiff's claims of deceit, misrepresentation, and concealment would amount to a rewriting of a contract that never existed. Because there are no specific material facts to substantiate plaintiff's several claims grounded in South Dakota's deceit statutes and common law, summary judgment is appropriate. RCRH's motion for summary judgment is accordingly granted with regard to plaintiff's claims of deceit, fraudulent misrepresentation, negligent misrepresentation, and fraudulent concealment.

44

### E.    NEGLIGENCE CLAIM AGAINST **RCRH**

As his ninth cause of action, plaintiff claims RCRH was negligent in its conduct in failing to abide by its obligations to plaintiff. (Pl.'s Compl. at 15-16.)  Because of RCRH negligent actions, plaintiff asserts that he sustained injuries and damages. (Id. at 16.)

RCRH argues that plaintiff's "independent claim of negligence simply has no application in the present case." (RCRH Br. at 35.)  In South Dakota, as RCRH maintains, "the law does not impose an independent duty of care upon parties engaged in negotiating a contract." (Id.)  In spite of RCRH's motion for summary judgment on the issue of negligence, plaintiff has failed to respond.

In accordance with the Court's standard of review, once a party moving for summary judgment "has fulfilled its burden of identifying the portions of the record which demonstrate an absence of a genuine issue of material fact, the nonmoving party must 'set forth specific facts showing that there is a genuine issue for trial.'"  Dush v. Appleton Elec. Co., 124 F.3d 957, 963 (8th Cir. 1997) (adhering to Handeen v. Lemaire, 112 F.3d 1339, 1346 (8th Cir. 1997) (quoting Anderson, 477 U.S. at 256, 106 S. Ct. at 2514)).  It is, therefore, "incumbent upon the nonmoving party to support its case with 'more than a scintilla of evidence.'"  Id. (following the language of F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir. 1997)).  See generally State v. Mesa, 2004 SD , ¶ 15, 681 N.W.2d 84, 88 (declaring that failure of a party "to raise an issue before the trial court can constitute waiver of the issue"); Williams v. Maulis, 2003 SD 138, ¶ 26, 672 N.W.2d 702, 707 (stating that a party's failure to reply to an issue may constitute a concession to the issue).  Plaintiff's mere allegations are insufficient to survive RCRH's properly supported

motion for summary judgment.  Fed. R. Civ. P. 56(e).  As to plaintiff's claim of negligence,

RCRH's motion for summary judgment is granted.

### F.   DEFAMATION & DEFAMATION *PER SE* CLAIMS AGAINST THE HEART DOCTORS & ALEX SCHABAUER, M.D.

The Heart Doctors and Schabauer contend that plaintiff cannot meet his burden of proof

in his claims of defamation and defamation *per se*.  (The Heart Doctors' & Schabauer's Mem. in

Supp. of Mot. for Summ. J. ("HDMS") at 5.)  Specifically, since plaintiff suffered no harm by the

alleged verbal statement that he was a "bad surgeon," The Heart Doctors and Schabauer argue

that plaintiff cannot sustain an action for slander or slander *per se*.  (Id.)  These defendants also

assert that plaintiff has not provided a single individual, including plaintiff, who can

acknowledge what the exact statement was and where it was made.  (Id. at 6-7.)  Finally, The

Heart Doctors and Schabauer argue that the claim fails because it was uttered in a meeting

protected by privilege, which thereby provides immunity from suit.  (The Heart Doctors' &

Schabauer's Reply to Pl.'s Resp. at 2-7.)

During the period of negotiations between plaintiff and the hospital, plaintiff maintains

that Schabauer made a defamatory remark during RCRH's Medical Staff Committee Meeting.

(Pl.'s Resp. to The Heart Doctors' & Schabauer's Mot. for Summ. J. ("PRM") at 4.)  At that

time, Schabauer was serving as the Chairman of the Cardiovascular Medicine and Surgery

Departments.  (See id.)  Because Schabauer's alleged derogatory comment that plaintiff was a

"bad surgeon" was made before other department heads, the statement was published, whereby

plaintiff suffered damages to his profession.  (Id.)  Arguing that Schabauer's statement was false,

plaintiff cites Hart's assessment of "good to very good" as to plaintiff's surgical success.  (Id. at

46

6.) Finally, to rebut The Heart Doctors' and Schabauer's claim that plaintiff suffered no harm, plaintiff contends that his prospective employment with the hospital may have been negatively affected by Schabauer's statement. (Id. at 7.)

"Every person is obligated to refrain from infringing upon the right of others not to be defamed." S.D. CODIFIED LAWS § 20-11-1 (1939). Though plaintiff has alleged an action of defamation and defamation *per se*, his claims are properly categorized as slander, which is a class of defamation. S.D. CODIFIED LAWS § 20-11-2 (1939). Slander is therefore defined, in pertinent part, as follows:

> [A] false and unprivileged publication, other than libel, which:
> . . . .
> (3)    Tends directly to injure him in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit; [or]
>
> . . . .
> (5)    By natural consequences, causes actual damage.

S.D. CODIFIED LAWS § 20-11-4 (1939). Under South Dakota law, therefore, "a defamation action may not survive if the alleged defamatory communication was privileged." Schwaiger v. Avera Queen of Peace Health Serv., 2006 SD 44, ¶ 8, 714 N.W.2d 874, 878 (citing Peterson v. City of Mitchell, 499 N.W.2d 911, 915 (S.D. 1993)). "The existence of privilege is a question of law" for the Court. Id. (following Sparagon v. Native Am. Publishers, Inc., 1996 SD 3, ¶ 26, 542 N.W.2d 125, 132).

Pursuant to this Court's Order of March 14, 2006, the discovery of supporting evidence regarding plaintiff's defamation claims was excluded because of its privileged nature, deriving from South Dakota's peer review statutes. The Court's bar to such proof significantly impedes

47

plaintiff's causes of action, because "[t]he proceedings, records, reports, *statements*, minutes, or any other data whatsoever" are inadmissable as evidence "*in any action of any kind in any court . . . .*" S.D. CODIFIED LAWS § 36-4-26.1 (2002) (emphasis added).  Without this evidence, plaintiff's defamation claims against The Heart Doctors and Schabauer fail as a matter of law.

### G.   INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS OR EXPECTANCY AGAINST THE HEART DOCTORS & ALEX SCHABAUER, M.D.

In contesting plaintiff's final cause of action, The Heart Doctors and Schabauer argue that a viable claim has not been established.  (HDMS at 8.)  First, these defendants contend the first element of the claim is nonexistent because a business relationship was not formed between RCRH and plaintiff.  (Id. at 9.)  In the alternative, The Heart Doctors and Schabauer maintain that there are no genuine disputes of material fact supporting this tort's other elements.  (Id. at 9-12.)

Plaintiff, in response, states that material issues of fact exist as to each of the five elements needed to successfully assert a claim of intentional interference with business relations or expectancy.  (PRM at 8.)  Specifically, as to each element, plaintiff argues that a valid business relationship or expectancy was established between RCRH and plaintiff, that Schabauer knew RCRH and plaintiff were engaged in discussions regarding plaintiff's employment, that The Heart Doctors and Schabauer unjustifiably interfered with plaintiff's opportunities to work at RCRH, that testimony provides proof the interference caused harm, and that he sustained damages because of these defendants' disruptions.  (Id. at 8-14.)  Under the elements, as plaintiff maintains, an action for intentional interference with a business relationship or expectancy should go forward to trial.

48

In Tibke v. McDougal, the South Dakota Supreme Court solidified the tort of intentional or tortious interference with a business relationship or expectancy. 479 N.W.2d 898, 908-09 (S.D. 1992). The essential elements to this action are as follows:

> (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted.

Id. at 908. "For this tort to occur, the business relationship, if in existence, need not be cemented by written or verbal contract and, whether or not it is in existence, it need not be intended that there be a contract." Hayes v. N. Hills Gen. Hosp., 1999 SD 28, ¶ 17, 590 N.W.2d 243, 248 (quotation marks and citation omitted). As such, "'[o]ne is liable for commission of this tort who interferes with business relations of another, both existing and *prospective*, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another.'" Id. (quoting N. Plumbing & Heating, Inc. v. Henderson Bros., Inc., 268 N.W.2d 296, 299 (Mich. Ct. App. 1978)) (emphasis added). For this tort to commence there must be an identifiable third party, Lien v. Lien, 2004 SD 8, ¶ 31, 674 N.W.2d 816, 826; that is, "there must be a 'triangle' – a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." Landstrom v. Shaver, 1997 SD 25, ¶ 75, 561 N.W.2d 1, 16.

As to this cause of action, plaintiff has produced material facts that are at issue, which preclude summary judgment. Here, there are three identifiable parties that form a "triangle": 1) plaintiff; 2) RCRH as the third party hoping to deal with plaintiff; and 3) defendants Schabauer and The Heart Doctors as the alleged interferers with plaintiff and RCRH. As to the substance of

49

the first element, although RCRH and plaintiff never entered into a contract, ample evidence throughout this opinion demonstrates that a *prospective* business relationship existed between RCRH and plaintiff.  (See Aff. of Richard Giesel at 1-2.)

With regard to the second element – that the interferer knew of the business expectancy – a genuine factual dispute has been exhibited through the testimony of Schabauer, Hart, and Zieske.  Schabauer testified that he heard from two other doctors that a *"locums* person," implicating plaintiff, was looking for employment with RCRH.  (Schabauer's Dep. at 80-81.) Schabauer and plaintiff also had conversations amongst themselves regarding plaintiff's prospective employment with RCRH.  (See Pl.'s Dep. at 200-10.)  Hart stated that since plaintiff began as a *locum tenens* physician with RCRH, The Heart Doctors were of the opinion that plaintiff was not "an individual that they wanted as part of the heart program." (Hart's Dep. at 85.)  The Heart Doctors did not want plaintiff practicing surgery in Rapid City or feel plaintiff possessed the experience to handle more complicated cases.  (Id. at 86.)  Hart's testimony derived from discussions he had with Schabauer and another doctor.  (Id.)  Zieske also averred that The Heart Doctors, in essence, threatened to refuse sending referrals to the hospital if plaintiff was the surgeon.  (Zieske's Dep. at 50.)  Such testimony establishes a genuine dispute of material fact.

The examination of the third element focuses upon whether The Heart Doctors' and Schabauer's intentional interference was unjustified.  St. Onge Livestock Co., Ltd. v. Curtis, 2002 SD 102, ¶ 15, 650 N.W.2d 537, 541.  A list of factors utilized in determining whether the interference was unjustified include: